UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

CARMEN L. BROWNING,               )
                                  )
            Plaintiff             )
                                  )
       v.                         )   Case No. 2:06 cv 436
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security   )
                                  )
            Defendant             )

<u>OPINION AND ORDER</u>

This matter is before the court on the Petition for Judicial Review of the Decision of the Commissioner of Social Security filed by the plaintiff, Carmen L. Browning, on June 13, 2007. For the reasons set forth below, the decision of the Commissioner is **AFFIRMED.**

<u>Background</u>

The plaintiff, Carmen L. Browning, applied for Supplemental Security Income March 28, 2001 (Tr. 69)  The claim was denied initially on August 8, 2001, and upon reconsideration on February 28, 2002. (Tr. 44, 50) Browning requested a hearing before an Administrative Law Judge ("ALJ") on March 12, 2002. (Tr. 52)  A hearing before ALJ Daniel Dadabo was held on September 9, 2002, at which vocational expert Grace Gianforte testified. (Tr. 732) On October 4, 2002, the ALJ denied Browning's application by written decision. (Tr. 13) Following a denial of her request for review by the Appeals Council on August 3, 2003, Browning filed a complaint in this court on December 27, 2006.

By the time of her Supplemental Security application in March, 2001 – her fourth according to the record – Browning indicated a series of conditions in support of her claim. (Tr. 62, 31, 64, 69) One of them was Hodgkins disease, which was treated with chemotherapy over a seven month period from January through August 1993, and since has been in remission. (Tr. 293-94)

From 1995 through 1998, Browning was employed as a bar-tender. (Tr. 124) During this period, in September 1995, Browning underwent an angioplasty to treat arterial stenosis. (Tr. 199-200) Following this procedure, Browning also underwent a coronary angiogram, stress test, coronary arteriogram, and echocardio-graphic study that indicated left ventricular diastolic dysfunc-tion. (Tr. 193) In January 1996, Browning reported to the emer-gency room with complaints of chest pain. (Tr. 228-29)  Dr. W. Florczak noted that she was not a candidate for repeat angio-plasty, and on January 26, 1996, Dr. Florczak performed a double bypass operation. (Tr. 210, 214-216)

On February 20, 1996, Browning reported to the emergency room with continued chest pain. (Tr. 259) In the course of a two-day hospitalization, x-rays showed a mildly enlarged heart (cardiomegaly), and venous doppler testing revealed no evidence of deep vein thrombosis. (Tr. 266, 209, 226) In March 1996, a stress test indicated no evidence of exercise induced cardiac ischemia. (Tr. 191) In a disability report completed by Browning with an earlier application for SSI, she indicated that she had

2

difficulty breathing when walking for one block, that she stayed home, and that she did some light cleaning. (Tr. 77-82)

On June 4, 1996, pulmonary function testing revealed a forced expiratory volume (FEV) of 1.87, which equated to a capacity of approximately 77% of a typical healthy person. (Tr. 295) However, on June 12, 1996, Dr. A. Landwehr completed a disability determination indicating that Browning was not disabled with respect to either ischemic heart disease or chronic pulmonary insufficiency (COPD). (Tr. 24)

In July 1997, Dr. Mohammed Ali, who treated Browning's Hodgkins disease, indicated in his notes that Browning experienced trouble sleeping, was prescribed Xanax, and was advised to see a psychiatrist. (Tr. 313) In a contemporaneous disability report completed by Browning with another application for SSI, Browning's alleged disability included a claim of depression. (Tr. 86) She also reported at this time that she cooked, did laundry and sewed, but that she was very depressed and did such tasks in 20 minute increments. (Tr. 96-101)

Almost two months later, on September 30, 1997, Browning was admitted through the emergency room with major depression and suicidal ideation and attempt. (Tr. 316) Upon admission, Browning indicated that she had been drinking 24 cans of beer and "ten shots of amaretto or blackberry" per day for the past 18 years and smoking three packs of cigarettes daily for the past 25 years. (Tr. 316) Browning remained hospitalized for about one week, and in a report generated a month later, psychologist Dr.

3

Jeffrey Karr indicated that Browning was "self-sufficient for meals, laundry, and shopping; dependant on family for travel." (Tr. 321) Browning reported ongoing difficulty sleeping and a focus on health concerns, including "cancer history, asthma, open heart surgery and headaches." (Tr. 322) Browning also indicated that she continued drinking three times a week, a 12-pack at a time. (Tr. 322) She noted a previous "alcohol related suicide gesture" seven years earlier and reported seeing a psychiatrist on an outpatient basis. (Tr. 322) On November 19, 1997, Browning's pulmonary function was rated at FEV 1.69, or 71% functional capacity. (Tr. 326-27)

Browning again was admitted to the emergency room on January 9, 1998, complaining of shortness of breath and chest pain. She was treated with steroids and a chest x-ray indicated no significant changes since prior x-rays. (Tr. 378, 379, 429) A disability determination from this period completed by Dr. H. Marciniak and Dr. K.J. Pressner indicated that Browning was not disabled as a result of either ischemic heart disease or substance addiction disorder. (Tr. 25) A Psychiatric Review Technique completed in January 1998, stated that Browning met the listing at 12.09B, substance addiction disorder, and demonstrated marked restrictions in the activities of daily living and maintaining social functioning. (Tr. 474-481)

Browning was admitted to the emergency room in August 1998 complaining of pain and numbness in her left arm and hand. (Tr. 360) A series of tests indicated an irritable duodenal bulb, but

4

the tests were otherwise unremarkable (Tr. 424-25, 439, 441, 365, 368, 407, 428, 437, 453) She was admitted again on November 8, 1998, suffering from pneumonia, and was discharged on November 15, 1998.  She again was admitted with pneumonia on December 22, 1998. Browning was discharged on January 6, 1999, but was read-mitted on January 9, 1999, complaining of severe joint pain. (Tr. 336, 341, 431) Browning was discharged with an assessment and plan that included continued use of Prednisone and inhalers for her pulmonary condition and an indication that her joint pain was caused by steroid withdrawal which would be addressed with pain medications and the initiation of steroids. (Tr. 339) Further records from September 3, 1999, appear to indicate that a uterus, cervix conization indicated chronic cervicitis and "focally invasive moderately-differentiated squamos cell carcinoma." (Tr. 445) In a disability report accompanying another SSI application, Browning made reference to arthritis, cervical cancer, breathing problems, and heart surgery. (Tr. 112-121) In a daily activities form, she indicated that she cooked, did laundry, and cleaned but that she had trouble cleaning and holding a mop and received assistance from her daughter. (Tr. 132)

A mental status exam conducted by the psychologist, Dr. Karr, in October 1999, indicated that Browning claimed to be self-sufficient for a number of chores and had ceased drinking alcohol. (Tr. 492)  Dr. Karr reported that Browning showed no overt indication of substance usage, but was "a vague informant" who was unwilling to give specific time frames and details. (Tr.

493) Dr. Karr reported that Browning was dysphoric, appeared to
have limited energy, and was periodically tearful. (Tr. 493) His
diagnosis was major depression, though he noted that there was no
indication of gross pyschopathology. (Tr. 494)

Also in October 1999, Browning was admitted to the emergency
room after experiencing chest pain while undergoing radiation
therapy. (Tr. 334) Dr. P. Ramon Llobet indicated unstable angina
and coronary artery disease and stated that in "view of the
significant risk factors, the past medical history, and lack of
follow up, I have recommended that patient have a coronary
angiogram." (Tr. 334-35)

Dr. Suresh Mahawar completed a consultative exam on November
2, 1999, noting Browning's complaints of joint pain, chest pain,
and shortness of breath. (Tr. 497) Dr. Mahawar, who referred in
the report to Browning as a "well-nourished, right-handed male,"
found that Browning was unable to hop or squat but otherwise
experienced only mild difficulties. (Tr. 499)

On January 4, 2000, Browning was admitted through the
emergency room with pneumonia. (Tr. 546) Dr. Shashidhar Divaka-
runi noted "large left sided pneumonia with upper left pneumo-
nia," hypo-tension, premature coronary artery disease, and
obesity. (Tr. 549) Dr. Divakaruni further reported that "I had a
very long discussion with the patient with the absolute need to
stop smoking." (Tr. 549)

In an RFC report completed on January 8, 2000, Dr. F. Mon-
toya concluded that Browning was able to lift 50 pounds occasion-

6

ally, could lift 25 pounds frequently, and was able to sit, stand, or walk six hours of an eight-hour day. (Tr. 509) A mental RFC completed on January 13, 2000 by Dr. Unversaw appears to indicate few limitations, noting that Browning lived alone and performed basic tasks. (Tr. 518)

In July 2000, Browning was hospitalized for four days with right upper lobe pneumonia and also sought treatment for a series of conditions, including depression, at the Immanuel Family Health Center.  She was treated by Dr. Chinyere Odeluga who prescribed the antidepressant Zoloft. (Tr. 581, 590)

On February 12, 2001, Browning was examined by Dr. Ali following an 18-month absence from his treatment. In his notes, Dr. Ali indicated that Browning's Hodgkins disease had been in remission since treatment in 1992 but that she suffered from multiple medical problems including asthma, coronary artery disease, depression, obesity, and cancer of the cervix. (Tr. 537) Dr. Ali noted that Browning did not follow through with the complete treatment for the cervical cancer. (Tr. 537) Browning saw Dr. Ali with complaints of dizziness which Dr. Ali noted "could be of no significance whatsoever." (Tr. 537) He added that "because of her poor history and of her non-compliance we will order CT scans." (Tr. 537)

On February 15, 2001, Browning reported to the emergency room with a foot injury, and two days later, again was hospital-ized for pneumonia. (Tr. 605, 614) A lung scan during this stay was negative for pulmonary embolism and malignancy. (Tr. 630,

7

639-644) In March 2001, Browning filed the current application for SSI. (Tr. 69)

The psychologist, Dr. Karr, again examined Browning on July 16, 2002. (Tr. 645) Browning indicated to Dr. Karr that she had trouble sleeping but was self-sufficient and was able to drive, use public transportation, shop, cook, and do laundry. (Tr. 645) She further indicated that she had not had alcohol for the prior three years and that she had "a psychiatric hospital history for depression but could not give specific precipitants or dates." (Tr. 646) Dr. Karr concluded with a diagnoses of major depression, noting that Browning did not exhibit gross psychopathology but did present in a noticeably dysphoric manner. A Psychiatric Review Technique completed by D. Unversaw in July 2001, indicated non-severe impairments and only mild functional limitations. (Tr. 658) The form included notes largely mirroring the report completed by Dr. Karr, indicating no gross psychopathology and Browning's ability to complete some household activities. (Tr. 660) A physical RFC completed in August 2001 by Dr. J. Sands indicated an ability to lift 20 pounds occasionally, lift 10 pounds frequently, and to sit, stand, or walk for up to six hours. (Tr. 671) Dr. Sands also completed a disability determination based upon asthma and affective disorders and found that Browning was not disabled. (Tr. 28)

Browning reported to the emergency room on November 28, 2001, with complaints of a cough, shortness of breath, and wheezing. (Tr. 706) The records reference Browning's chronic

obstructive pulmonary disease and indicate that after hospital-
ization for two days, she was discharged. (Tr. 706)

     At a hearing before ALJ Dadabo on September 9, 2002, Brown-
ing testified that she experienced chest pains about twice a week
for which she took Nitroglycerine. (Tr. 735) Browning, who had
broken out in hives based on her nervousness regarding the
hearing, also indicated that she typically reported to the
emergency room twice a year with pneumonia. (Tr. 736, 738)
Browning indicated that she had been diagnosed with diabetes and
experienced regular joint pain.  (Tr. 749) She stated that she
had not used alcohol or drugs for about four years. (Tr. 744-45)
She believed that her weight gain of about 50 pounds was related
to her depression. (Tr. 746) She reported that her depression
went back prior to 1998 and included experiencing difficulty in
concentrating. (Tr. 747) Browning indicated that she read and
watched television, made herself something to eat, and cried
frequently, though not daily. (Tr. 748)

     The ALJ questioned Browning regarding two jobs she held for
a few months in late 2000 at a Citgo and at a Wal-mart. (Tr. 752)
She stated that she left the Citgo job "because they weren't
paying me enough [and] also when I was there at Citgo, I wound up
in the hospital with pneumonia." (Tr. 753) Browning replied that
she left the Wal-Mart job because she was unable to stand. (Tr.
752) She noted that she must sit after standing for 20 minutes
due to pain in her knees. (Tr. 753)

9

The vocational expert, Grace Gianforte, questioned Browning
regarding her security job. (Tr. 761) Browning replied that she
held the job for approximately five to six months and that it
entailed walking the floors of a senior living facility and
monitoring security cameras. (Tr. 761) She also stated that she
left the job due to illness. (Tr. 762) The ALJ presented hypothe-
ticals to the VE based upon the ability to do sedentary work
which required a controlled work environment. The VE responded
that this did not preclude the security work and also included
cashier, information clerk, and "printed checker credit author-
izer" jobs. (Tr. 765) The ALJ next altered the hypothetical to
include limitations for low stress, including minimal interaction
with co-workers and supervisors and no public contact.  The VE
indicated that these same jobs would remain available.  (Tr. 767-
68)

In his decision denying benefits, the ALJ reviewed Brown-
ing's heart condition and 1997 hospitalization for depression.
(Tr. 18) He also noted that the GAF of 65 at that time indicated
only mild symptoms. (Tr. 18)  He noted that in October 1999,
Browning indicated that she had quit drinking and had related
these hospitalizations to alcohol and drug use. (Tr. 18) The ALJ
also noted that Browning experienced improvement for depression
through Zoloft. (Tr. 19)

The ALJ concluded that Browning retained a capacity for
"sedentary work, subject to the need for a sit/stand accommoda-
tion, a low-stress work environment and an environment free of

respiratory irritants." (Tr. 29) In determining this RFC, the ALJ found Browning was not credible to the extent her allegations were inconsistent with the RFC. (Tr. 20) He noted that Browning engaged in daily activities and, though alleging concentration deficits, also liked to read. (Tr. 21) He noted that after applying for benefits, Browning applied for and got a job as a gas station cashier, stating that "she quit only because they were not paying enough." (Tr. 21)

The ALJ also concurred with the state agency physicians who found "only mild limitations in the claimants (sic) daily activities, social function in and in concentration, persistence and pace, and no evidence of repeated episodes of decompensation." (Tr. 22)

<u>Discussion</u>

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence.  42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."). *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct 1420, 1427, 28 L.Ed.2d 852 (1972) (*quoting **Consolidated Edison Company v. NLRB,***

305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)).
*See also* **Sims v. Barnhart**, 309 F.3d 424, 428 (7th Cir. 2002);
**Green v. Shalala,** 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's
decision must be affirmed if the findings are supported by sub-
stantial evidence and if there have been no errors of law.
**Golembiewski**, 322 F.3d at 915; **Cannon v. Apfel,** 213 F.3d 970, 974
(7th Cir. 2000).  However, "the decision cannot stand if it lacks
evidentiary support or an adequate discussion of the issues."
**Lopez ex. rel. Lopez v. Barnhart**, 336 F.3d 535, 539 (7th Cir.
2003).

Supplemental insurance benefits are available only to those
individuals who can establish "disability" under the terms of the
Social Security Act.  The claimant must show that she is unable
"to engage in any substantial gainful activity by reason of any
medically determinable physical or mental impairment which can be
expected to result in death or which has lasted or can be ex-
pected to last for a continuous period of not less than 12
months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations
enumerate the five-step sequential evaluation to be followed when
determining whether a claimant has met the burden of establishing
disability.  20 C.F.R. §416.920.  The ALJ first considers whether
the claimant is presently employed or "engaged in substantial
gainful activity." 20 C.F.R. §416.920(b).  If she is, the claim-
ant is not disabled and the evaluation process is over; if she is
not, the ALJ next addresses whether the claimant has a severe
impairment or combination of impairments which "significantly

12

limits . . . physical or mental ability to do basic work activi-
ties."  20 C.F.R. §416.920(c).  Third, the ALJ determines whether
that severe impairment meets any of the impairments listed in the
regulations.  20 C.F.R. §401, pt. 404, subpt. P, app. 1.  If it
does, then the impairment is acknowledged by the Commissioner to
be conclusively disabling.  However, if the impairment does not
so limit the claimant's remaining capabilities, the ALJ reviews
the claimant's "residual functional capacity" and the physical
and mental demands of her past work.  If, at this fourth step,
the claimant can perform her past relevant work, she will be
found not disabled. 20 C.F.R. §416.920(e).  However, if the
claimant shows that her impairment is so severe that she is
unable to engage in her past relevant work, then the burden of
proof shifts to the Commissioner to establish that the claimant,
in light of her age, education, job experience and functional
capacity to work, is capable of performing other work and that
such work exists in the national economy.  42 U.S.C. §423(d)(2);
20 C.F.R. §416.920(f).

Browning first challenges the ALJ's determination that her
depression was not severe, relying largely on the evidence of her
hospitalizations and examination by Dr. Karr from 1997 to 1999.
The Commissioner responds that this evidence is of limited
relevance to a March 2001 application for SSI.

The Social Security administration provides benefits under
two distinct programs. ***Bowen v. City of New York***, 476 U.S. 467,
469-70, 106 S.Ct. 2022, 2024, 90 L.Ed.2d 462 (1986).

> The Social Security Disability Insurance
> Program (SSD) established by Title II of the
> Social Security Act, 49 Stat. 622, as amend-
> ed, 42 U.S.C. §401 *et seq.*, pays benefits to
> disabled persons who have contributed to the
> program and who suffer from a mental or phys-
> ical disability. The Supplemental Security
> Income Program (SSI) established by Title XVI
> of the Act, 86 Stat. 1465, as amended, 42
> U.S.C. §1381 *et seq.*, provides benefits to
> indigent disabled persons.

> ***Bowen***, 476 U.S. at 470, 106 S.Ct. at 2024-25

*See also* ***Splude v. Apfel***, 165 F.3d 85, 87 (1st Cir. 1999).

Under Title XVI (SSI), eligibility for benefits begins in the month during which the application is filed. Title 20 C.F.R §416.335 provides:

> When you file an application in the month
> that you meet all the other requirements for
> eligibility, the earliest month for which we
> can pay you benefits is the month following
> the month you filed the application. If you
> file an application after the month you first
> meet all the other requirements for eligibil-
> ity, we cannot pay you for the month in which
> your application is filed or any months be-
> fore that month.

> 20 C.F.R. §416.335

*See also* ***Karagozian v. Shalala***, No. 93 C 6690, 1995 WL 234637 at *3 (N.D. Ill. March 31, 1995); ***Scott v. Chater***, Civ. A. No. 95-5442, 1996 WL 224674 at *4 n.3 (E.D. Pa. April 26, 1996)("A SSI applicant such as plaintiff is not eligible for the payment of benefits for any time period before the month she files her SSI application, even if she may have been disabled before that month.").

Browning relies on Social Security Ruling 83-20, particu-

larly its guidance in determining the onset date in non-trau-
matic, slowly progressing impairments, and the Seventh Circuit
decision in *Allord v. Barnhart,* 455 F.3d 818, 822 (7th Cir.
2006)("We said in *Wilder v. Apfel*, 153 F.3d 799, 802 (7th Cir.
1998) that what is required to establish a retrospective diagno-
sis is contemporaneous corroboration [contemporaneous with the
period of coverage, that is] of the mental illness, . . . not
necessarily contemporaneous medical corroboration. Retrospective
diagnosis of an impairment, even if uncorroborated by contempora-
neous medical records, but corroborated by lay evidence relating
back to the claimed period of disability, can support a finding
of past impairment." ) (internal citations omitted).

Neither the ruling nor the Seventh Circuit's decision
support Browning's argument. SSR 83-20 itself provides that in
Title XVI (SSI) cases, determining a specific onset date ordi-
narily is not necessary because "onset will be established as of
the date of filing." SSR 83-20 at *7. Further, in *Allord*, the
court was concerned with a retroactive diagnosis in a disability
insurance benefits (DIB) case, regarding evidence "relating . . .
to the claimed period of disability." In this instance, the
claimed period of disability begins in March 2002. *See Scott*,
1996 WL 224674 at *4 n.3 ("Accordingly, only the evidence con-
cerning plaintiff's condition during and after March, 1991 is
relevant")

Consequently, even if Browning can prove that she was
disabled in 1997 or 1999 (a question that presumably was ad-

15

dressed by the SSI applications she filed at that time) she has
not addressed the primary question on which SSI benefits hinge.
Though a conclusion that in this earlier period Browning was
disabled may have some probative value, it cannot replace the
ALJ's primary obligation to address the question as of March
2001, when her application was filed. In fact, the ALJ considered
evidence that predated the SSI application. Browning, who refers
to the three consultative exams with Dr. Karr as "numerous
consultations" in which Dr. Karr "always noted that she suffers
from major depression," accuses the Commissioner of misstating
this evidence. In doing so, Browning fails to acknowledge that
the ALJ accurately noted that Dr. Karr found no gross psycho-
pathology, that Dr. Karr's report itself indicated that Brown-
ing's hospitalizations for suicidal ideation were "related to her
drinking," and that she no longer used alcohol. The ALJ also
noted that during this earlier period, Browning was rated with
only mild conditions, including a GAF of 65. The ALJ also con-
cluded that following Dr. Karr's consultative exam in 2001, Dr.
Karr again noted "no gross psychopathology."

In addition, the ALJ was entitled to rely on state agency
physicians, who described only mild functional limitations. SSR
96-6p provides that ALJs are "not bound by findings made by State
agency or other program physicians and psychologists, but they
may not ignore these opinions and must explain the weight given
to the opinions in their decisions."  The ruling goes on to state
that these opinions can be given weight "only insofar as they are

16

supported by evidence in the case record" and may under some
circumstances "be entitled to greater weight than the opinions of
treating or examining sources."

Consequently, the ALJ erred only if the conclusions of the
state agency physicians are unsupported by evidence in the
record. Browning, though generally suggesting that these opinions
are inconsistent with the evidence, fails to address the fact
that these opinions are supported. The ALJ explained the consis-
tency in light of Dr. Karr's examinations and treatment notes
indicating successful use of medication. Browning points to
little to suggest the inconsistency of these opinions. Browning
appears to suggest that the hospitalizations she underwent prior
to her SSI application demonstrates inconsistent evidence.
However, even if this were evidence of greater than mild condi-
tions (notwithstanding that these events significantly predate
Brownings's SSI application), the state agency opinions still
have support in the record. In fact, for the period relevant to
her SSI application, there is little evidence beyond Dr. Karr's
report, the state agency opinions, and the treatment notes from
Immanuel. The ALJ referred to each of these in the course of his
decision.

Browning also alleges that the ALJ characterized her mental
condition as arising solely because of her alcohol use. This
statement is not accurate. The most that can be said is that the
ALJ related Browning's hospitalization in 1997 for suicidal
ideation to alcohol use. Browning herself indicated that the

17

event was at least related to abuse of alcohol in her exam with Dr. Karr, and the ALJ relied on evidence that by 2001 her alcohol use had ceased. Accordingly, there is no support for Browning's statement that the ALJ portrayed her mental impairments as being solely related to alcohol.

Browning next confuses the standard for severity as used generally in step two of the familiar five-step analysis (*see* 20 C.F.R. §404.1520(a)(4)(ii)) compared with the use of the term "severe" with respect to mental impairments described in 20 C.F.R. §416.920a(d)(1). This latter regulation states that "[i]f we rate the degree of your limitation in the first three functional areas as 'none' or 'mild' and 'none' in the fourth area, we will generally conclude that your impairment(s) is not severe." The regulation goes on to provide that if the impairment is severe, "we must then determine if it meets or is equivalent in severity to a listed mental disorder," and if not "we will then assess your residual functional capacity." 20 C.F.R. §416.920a(d)(2), (3).

The evidence, including Dr. Karr's exam and the Psychiatric Review Technique contemporaneous with Browning's SSI application, concluded that no severe impairment existed and found only mild restrictions in two of the four categories. Browning has provided no evidence from the relevant period that is inconsistent with these conclusions. Accordingly, the ALJ's conclusion that Browning's mental impairments were not severe is supported. After

18

making this conclusion, the regulations do not require the ALJ to assess the RFC further.

Browning also argues with respect to her mental condition that the ALJ was required to order a Medical Source Statement based upon a regulation that states "we will ordinarily request, as part of the consultative examination process, a medical source statement." However, Browning presents no argument in response to the Commissioner's statement that the assessments by the state agency physicians are medical sources. *See Skinner v. Astrue*, 478 F.3d 836, 843-44 (7th Cir. 2007); *Bailey v. Barnhart*, 39 Fed. Appx. 430, 435 (7th Cir. 2002); *Lembke v. Barnhart*, 2006 WL 3834104, *11 (W.D. Wis. 2006).

Browning next argues that the ALJ "played doctor" by inappropriately dismissing an opinion from Dr. Gambetta and failing to contact Dr. Gambetta to receive further evidence. An ALJ has reached beyond his role and "plays doctor" when he has rejected a doctor's medical conclusion without other evidence or has drawn a medical conclusion without reference to medical evidence. *See Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001); *Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000). *See also Armstrong v. Barnhart*, 287 F.Supp.2d 881, 885 (N.D. Ill. 2003)(noting that the accusation of playing doctor "may be tossed about a bit too casually.").

The ALJ noted that no evidence in the record indicated specific work restrictions for Browning, with the exception of Dr. Gambetta, who stated that Browning cannot walk any distance

without severe pain. Dr. Gambetta also did not rate any other
functional capabilities and instead wrote in the margin of the
form what appears to be the statement "cannot answer neg." It is
not clear what this statement means. However, contrary to
Browning's assertion that the ALJ ignored this statement, in fact
he assumed the statement was intended to convey the opinion that
Browning was not capable of performing any work related activi-
ties. He went on, with sufficient citation to medical evidence,
to find that such a conclusion was not supported by the record as
a whole.

It cannot be said that the ALJ's conclusion was drawn with-
out the benefit of medical evidence. Accordingly, he did not play
doctor and, in light of the assumptions under which he addressed
this form, there is no further reason for the ALJ to order
additional records from Dr. Gambetta. *See e.g.* ***Skarbek v. Barn-
hart***, 390 F.3d 500, 504 (7th Cir. 2004).

Browning next argues that the ALJ erred in giving her
testimony less than full credibility.  This court will sustain
the ALJ's credibility determination unless it is "patently wrong"
and not supported by the record. ***Schmidt v. Astrue***, 496 F.3d 833,
843 (7th Cir. 2007); ***Prochaska v. Barnhart***, 454 F.3d 731, 738 (7th
Cir. 2006) ("Only if the trier of fact grounds his credibility
finding in an observation or argument that is unreasonable or
unsupported . . . can the finding be reversed."). The ALJ's
"unique position to observe a witness" entitles his opinion to
great deference.  ***Nelson v. Apfel***, 131 F.3d 1228, 1237 (7th Cir.

20

1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ does not make explicit findings and does not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which she is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symp-toms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt v.*

21

*Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005)("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective medical evidence."  SSR 96-7p, at *1.  *See also **Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004).  ***Carradine v. Barn-hart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disen-title the applicant to benefits.").  Rather, if the

> [c]laimant indicates that pain is a signifi-cant factor of his or her alleged inability to work, the ALJ must obtain detailed de-scriptions of the claimant's daily activities by directing specific inquiries about the pain and its effects to the claiming.  She must investigate all avenues presented that relate to pain, including claimant's prior work record, information and observations by treating physicians, examining physicians, and third parties.  Factors that must be considered include the nature and intensity of the claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for relief of pain, functional restrictions, and the claimant's daily activities.  (internal citations omitted).
>
> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir. 1994)

*See also Zurawski v. Halter*, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ discounts the claimant's description of pain because it is inconsistent with the objective medical evidence, he must make more than "a single, conclusory statement . . . . The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, at *2. *See Zurawski*, 245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir. 1995) (finding that the ALJ must articulate, at some minimum level, his analysis of the evidence). He must "build an accurate and logical bridge from the evidence to [his] conclusion." *Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872). When the evidence conflicts regarding the extent of the claimant's limitations, the ALJ may not simply rely on a physician's statement that a claimant may return to work without examining the evidence the ALJ is rejecting. *See Zurawski*, 245 F.3d at 888 (*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986)) ("Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be *examined*, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight.") (emphasis in original).

23

The ALJ concluded that Browning retained a capacity for sedentary work, with the additional requirements of a sit-stand option, a low-stress environment, free of respiratory irritants, fumes, dust, or temperature extremes. To the extent that Browning has alleged she was incapable of this level of work, he found her less than credible. In doing so, he noted that she engaged in some daily activities, which according to Dr. Karr's July 16, 2001 report, included using public transportation, shopping, and doing laundry. The ALJ also noted the fact that after applying for SSI Browning also applied for and got a job as a cashier. She held this job for two months and testified that her reason for leaving was that the job did not pay enough. The ALJ next noted that no doctor described specific physical restrictions. Further, though the state agency physicians concluded that Browning was capable of light work, the ALJ described an RFC for only sedentary work.

As already noted, the ALJ's conclusions regarding Browning's mental impairments also were supported by medical evidence. In addition, these impairments were incorporated into the RFC through the addition of a low-stress environment restriction. In her brief, Browning claims that the ALJ specified low stress only to indicate the need "to avoid cardiac stress and does not account for her depression." (Plaintiff's Memorandum, p. 23) Browning's assertion is belied by the ALJ's questioning of the vocational expert at the hearing, when he stated that "by low stress I generally mean minimal interaction, with co-workers,

24

supervisors, and definitely the public." (Tr. 767) Clearly, the ALJ's hypothetical incorporates a response to evidence of non-severe depression.

Browning also faults the ALJ for mentioning in passing that, despite suffering from a chronic pulmonary condition, she continues to smoke. In her brief, Browning spends considerable effort addressing the difficulty of quitting smoking. The court does not disagree. However, this reference was not the basis of the decision, and without the reference, the ALJ's decision remains supported by substantial evidence.

Finally, Browning alleges that the ALJ at step four erroneously determined that Browning could return to her past relevant work. The ALJ must address a claimant's past relevant work with some particularity. The ALJ may not classify the job under "broad generic occupational classifications." *See* SSR 86-21. However,

> [t]he issue is not whether the applicant for benefits can return to the precise job he held, which is hardly likely to have been kept open for him, but whether he can return to a job he held that exists at other employers. However, the job must not be described so broadly as to encompass a range of physical and mental abilities some of which the applicant may not have; and that is the case if the job is described merely as "sedentary work."
>
> ***Smith v. Barnhart***  388 F.3d 251, 253 (7th Cir. 2004)

*See also* **Duerson v. Astrue**, No. 1:07 CV 70, 2007 WL 222292 at *4 (S.D. Ind. January 25, 2008)(examining past relevant work based

on "how a *particular* job was *generally* performed.")(emphasis
added).

Browning faults the ALJ because the VE was not asked specif-
ically if Browning's past relevant work included a sit-stand
option. However, in this instance, the vocational expert was
present at the hearing and questioned Browning directly regarding
her past work. Further, the VE noted that Browning performed the
cashier job with a sit-stand option. In addition, Browning
testified that as a surveillance monitor she was required to walk
the floor hourly, but otherwise sat "most of the day." (Tr. 763)
Consequently, there is no basis to conclude that the the ALJ's
decision would be altered upon asking for details specifically
that were the subject of testimony at the hearing. *See e.g.*
*Hanrahan v. Shalala*, 831 F.Supp. 1440, 1443-44 (E.D. Wis. 1993)
("According to the ALJ, a number of job positions involving
sedentary work with a sit/stand option could be filled by the
plaintiff, including certain types of security work."); *Chrisman
v. Astrue*, 487 F.Supp.2d 992, 1002 (N.D. Ill. 2007) (*quoting
Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)) (stating
that when the court can trace the ALJ's reasoning, the failure to
discuss specific testimony does not require a remand and noting
that "No principle of administrative law or common sense requires
us to remand a case in quest of a perfect opinion unless there is
reason to believe that the remand might lead to a different
result.").

_____

For the foregoing reasons, the decision of the Commissioner is **AFFIRMED**.   The Clerk is **DIRECTED** to close this case.

ENTERED this 24th day of March, 2008

                    s/ANDREW P. RODOVICH
                      United States Magistrate Judge

27